UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF PLUMBERS LOCAL
98 DEFINED BENEFIT PENSION
FUND, *et al.*,

           Plaintiffs,

                           Case No. 23-11021

v.                      U.S. DISTRICT COURT JUDGE
                               GERSHWIN A. DRAIN

DAN ALLOR PLUMBING AND
HEATING COMPANY, *et al.*,

           Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANT ALLOR PLUMBING'S MOTION FOR SUMMARY JUDGMENT [#76], DENYING DEFENDANT PATRICK DAY'S MOTION FOR SUMMARY JUDGMENT [#77], GRANTING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [#78], DENYING DEFENDANTS DAN ALLOR PLUMBING AND HEATING COMPANY AND DANIEL ALLOR'S MOTION FOR SUMMARY JUDGMENT [#79], AND DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUR-REPLY IN RESPONSE TO DEFENDANT PATRICK DAY'S MOTION FOR SUMMARY JUDGMENT [#99]**

## I.    INTRODUCTION

Presently before the Court are the following: (1) Defendant Allor Plumbing,

LLC's ("AP") Motion for Summary Judgment [#76]; (2) Defendant Patrick Day's

Motion for Summary Judgment [#77]; (3) Plaintiffs' Motion for Partial Summary

Judgment [#78]; (4) Defendants Dan Allor Plumbing and Heating Company ("DAP") and Daniel Allor's Motion for Summary Judgment [#79]; and (5) Plaintiffs' Motion for Leave to File a Sur-Reply in Response to Defendant Patrick Day's Reply in Support of His Motion for Summary Judgment [#99]. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of these motions. As such, they will be resolved on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons that follow, AP's Motion for Summary Judgment is DENIED, Patrick Day's Motion for Summary Judgment is DENIED, Plaintiffs' Motion for Partial Summary Judgment is GRANTED IN PART, DAP and Daniel Allor's Motion for Summary Judgment is DENIED, and Plaintiffs' Motion for Leave to File a Sur-Reply in Response to Defendant Patrick Day's Motion for Summary Judgment is DENIED.

## II.    **BACKGROUND**

This is an ERISA case. Plaintiffs Plumbers Local 98 Defined Benefit Pension Fund, Plumbers Local 98 Defined Contribution Fund, Plumbers Local 98 Insurance Fund, Plumbers Local 98 Sub Trust Fund, Plumbers Local 98 Retiree Benefit Fund, Metro-Detroit Plumbing Industry Training Trust, and Joint Administrative Committee of the Plumbing & Pipefitting Industry in the Detroit Area's (collectively, "Plaintiffs" or "the Funds") claims against Defendants DAP, AP,

2

Daniel Allor, and Patrick Day stem from DAP's and AP's alleged failure to pay fringe benefit contributions for all employees performing work covered by DAP's collective bargaining agreement with Journeymen Plumbers Local 98 ("Local 98" or "the Union").

DAP is a company owned by Daniel Allor. ECF No. 78-12, PageID.1375. It has been around since at least 1979 and formally incorporated in 1982. ECF No. 78-2, PageID.1153. From its inception until approximately 2014, DAP was in the business of providing plumbing and general contracting services on construction projects. *See* ECF No. 79-6, PageID.2091. Daniel Allor serves as its President, Treasurer, and Secretary, and Cindy Sieloff, Daniel Allor's daughter, serves as its Director. ECF No. 78-3; ECF No. 78-2, PageID.1149. Daniel Allor is the final decisionmaker with respect to what bills and invoices are paid by DAP. ECF No. 78-12, PageID.1374.

AP, a company founded and owned by Patrick Day, also offers plumbing and general contracting services. *See* ECF No. 78-9, PageID.1303-04. It incorporated in 2008 and has been operational since approximately 2014. ECF No. 78-9, PageID.1304; ECF No. 78-10. Prior to founding AP, Day worked as an estimator at Allor Mechanical, a company owned by Daniel Allor's wife. ECF No. 78-9, PageID.1304-06; ECF No. 78-2, PageID.1155.

Also in 2014, DAP changed the nature of its business model. It stopped

bidding on construction projects and began operating as a "staffing agency," subcontracting labor to contractors. ECF No. 79-6, PageID.2091; ECF No. 78-12, PageID.1377. This change came about because of Daniel Allor's health issues and desire to retire. ECF No. 79-6, PageID.2091. That same year, DAP and AP entered into a Subcontractor Agreement, under which DAP is responsible for providing labor for certain AP projects. ECF No. 79-8. This Agreement "renew[s] annually with no changes" absent a written addendum. *Id.* at PageID.2225. Furthermore, it enables AP to hire non-union employees, in addition to DAP employees. As a result, DAP and AP employees often work alongside one another on the same projects, where they perform the same kind of work, use the same equipment, and are subject to the same supervision. Since at least 2016, AP has been DAP's sole customer. ECF No. 78-12, PageID.1376-77.

Although DAP and AP are separate companies, their operations overlap significantly. For example, they share an office space and business address. ECF Nos. 78-3; 78-10; 79-9; 78-12, PageID.1379. From 2014 through at least 2023, AP employees processed payroll for both DAP and AP. ECF No. 78-33, PageID.1682-83. Furthermore, from 2014 to 2021, Pam Fife, an AP employee and Patrick Day's sister, processed DAP's fringe benefit contributions on DAP's behalf. *Id.* at PageID.1694; ECF No. 78-23, PageID.1539. She also submitted tax and corporate documents on DAP's behalf, as well as served as its point of contact during an audit.

ECF Nos. 78-37; 78-34, PageID.1713. Additionally, Jeff Fife, Pam Fife's brother-in-law and a superintendent at AP, exercised supervisory authority over DAP and AP employees. He also worked with Joe Fife, a superintendent at DAP, to assign and schedule labor. ECF No. 78-23, PageID.1538-39. Joe Fife is Jeff Fife's brother, Pam Fife's husband, and Patrick Day's brother-in-law. *Id.* at PageID.1536, 1539. Prior to beginning at AP, Jeff Fife worked at DAP as a superintendent. ECF No. 78-17, PageID.1432.

From at least May 11, 2022 through April 30, 2023, DAP's and AP's use of the same business address was established pursuant to a lease agreement between D&D Allor Investments, LLC—a company owned by Daniel Allor—and AP. ECF No. 79-9. This agreement also provided that AP would provide the "Landlord/Owner" with "use of common spaces, telephone, fax machine, internet, [and] copy equipment," as well as "approximately eight (8) hours of administration/staffing per month for the duration of this lease." *Id.* at PageID.2246.

DAP became affiliated as a union contractor with Local 98 in the 1980s. ECF No. 78-2, PageID.1157. It is undisputed that DAP was bound to a collective bargaining agreement ("CBA") with Local 98 from the 1980s until approximately March 2009, when DAP attempted to terminate its participation in collective bargaining with Local 98. *See* ECF No. 79, PageID.1916. The CBA in place at the time of DAP's attempted termination was a multi-employer agreement between

Local 98 and the Mechanical Contractors Association of Detroit ("MCA"), which took effect on June 26, 2008 and was set to expire on May 31, 2011. *Id.*; ECF No. 79-3. It required DAP to, among other things, hire Local 98 union workers for all jobs within Local 98's geographic jurisdiction and pay fringe benefit contributions to the Funds for employees performing work covered by the CBA. *Id.* It also provided that written notice of termination of the CBA was to be sent to Local 98 "not more than ninety (90) days nor less than sixty (60) days prior to its expiration date," and that absent such notice, the CBA "shall continue in effect from year to year." *Id.* at PageID.1988-89.

DAP attempted to terminate its participation in this CBA in early 2009. On February 18, 2009, it sent a letter to MCA, notifying it that it was terminating the "Labor Agreement" upon its May 31, 2009 expiration date and that it was willing to meet and confer for the purpose of negotiating a new labor contract. ECF No. 79-2, PageID.1949. It then sent a letter to Local 98 on March 2, 2009, informing it that "effective immediately, [DAP] withdraw[s] any Letter of Assent or Power of Attorney it may have with [MCA]," that DAP "will no longer participate in collective bargaining with Plumbers Local 98 as part of [MCA]," and that MCA "will no longer represent [DAP] in collective bargaining with Plumbers Local 98." *Id.* at PageID.1953. Both of these letters were signed by Daniel Allor. ECF No. 79-2.

Notwithstanding DAP's attempt to terminate its participation in collective bargaining with Local 98, DAP continued to hire Local 98 employees, paying them union wages and fringe benefit contributions. ECF No. 78-2, PageID.1152. Furthermore, DAP continued to request Local 98 targeting funds, even after it stopped bidding on projects. ECF No. 78-14. Targeting funds are funded by Local 98 membership dues and are available only to contractors that collectively bargain with Local 98. ECF No. 78-4, PageID.1169; ECF No. 78-5, PageID.1174. They are intended to help Local 98-affiliated contractors compete against non-union contractors for work by offsetting the price of union labor, as well as to ensure work is available for Local 98 union members. ECF No. 78-4, PageID.1169; ECF No. 78-5, PageID.1174. DAP often passed these funds along to AP, which, as a non-union contractor, is itself ineligible to receive these funds. *See* ECF Nos. 78-13, 78-14, 78-44. DAP did not indicate to Local 98 that these funds were for AP projects, and had it known, Local 98 would not have awarded the targeting funds to DAP. ECF No. 78-4, PageID.1170; ECF No. 78-5, PageID.1175.

On May 2, 2023, the Funds initiated the present lawsuit by filing a complaint against DAP, Daniel Allor, Cindy Sieloff, and AP. The complaint alleges, in relevant part: (1) that DAP breached its CBA with Local 98 and violated Section 515 of ERISA, 29 U.S.C. 1145, by failing to pay fringe benefit contributions for all covered work (Count I); (2) that DAP and AP are alter egos of one another and, as such, AP

is bound by the CBA requiring it to pay fringe benefit contributions (Count II); (3) that Daniel Allor and Cindy Sieloff breached their fiduciary duties under 29 U.S.C. § 1002(21)(A) by failing to pay fringe benefit contributions for all covered work (Count III); and (4) that Daniel Allor and Patrick Day should be held personally liable for DAP's and AP's outstanding fringe benefit payments under a corporate veil-piercing theory (Count IV). ECF No. 1. Pursuant to a stipulated order between the parties, Cindy Sieloff was dismissed from this case with prejudice on February 7, 2025. ECF No. 92.

All parties, except Cindy Sieloff, filed motions for summary judgment on December 19, 2024. Responses were filed on January 23, 2025, and Replies were filed on February 13, 2025. The Court did not hold a hearing on these motions.

On February 19, 2025, Plaintiffs filed a motion for leave to file a sur-reply responding to Defendant Patrick Day's Reply in support of his motion for summary judgment. Plaintiffs argue that Day's Reply introduced exhibits that were not disclosed in discovery nor in prior motion practice. Day filed a Response on March 5, 2025, asserting that these exhibits directly counter Plaintiffs' unsupported claim that Day and Daniel Allor did not tell anyone outside of key management about AP's existence, and that Plaintiffs have not identified a basis for which leave to file a sur-reply should be granted. Plaintiffs have not yet filed a Reply.

### III.   <u>LEGAL STANDARD</u>

Under Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004) (citation omitted). A genuine dispute of material fact, also referred to as a question of fact, exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Id.*

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A movant that is subject to a preponderance of the evidence burden must present enough evidence "to allow a reasonable juror to conclude that the

[movant's] position *more likely than not* is true." *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1073 (6th Cir. 1993) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)) (emphasis in original). A movant "does not meet this burden when . . . the record is in 'equipoise' or 'evenly balanced' on an essential element's existence," as is the case when the record before the court is silent with respect to an essential element. *See Pineda*, 977 F.3d at 491 (citations omitted).

## IV.   ANALYSIS

### A. DAP's and AP's Alter Ego Status

First, Plaintiffs, DAP and Daniel Allor, and AP cross-move for summary judgment on Plaintiffs' claim that AP and DAP are alter egos of one another. The alter ego doctrine is an equitable doctrine designed to prevent companies from evading their legal obligations "merely by changing or altering their corporate form." *NLRB v. Allcoast Transfer*, 780 F.2d 576, 579 (6th Cir. 1986). In the labor law context, alter ego liability typically arises in two factual contexts. The first occurs in traditional successor liability cases, "when the new entity begins operations but is merely a disguised continuance of the old employer." *Trs. of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009) (cleaned up). The second is referred to as a "double-breasted operation," which occurs when "two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* (citation omitted).

In the context of ERISA unpaid fringe benefit cases, the Sixth Circuit adheres to the NLRB's alter ego standard, which is a "relaxed" version of the traditional alter ego test and is designed to "effectuate federal labor policies." *Industrial Contracting, LLC*, 581 F.3d at 318; *NLRB v. Fullerton*, 910 F.2d 331, 336 (6th Cir. 1990). Under this standard, courts consider "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership," as well as the employer's intent to evade the obligations of a collective bargaining agreement. *Industrial Contracting, LLC*, 581 F.3d at 318 (citation omitted); *Road Sprinklers Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012). No one factor is controlling, and not all factors need to be present to support a finding of alter ego status. *Id.* For the reasons that follow, seven of these factors—business purpose, operations, equipment, customers, supervision, management, and intent—support a finding that DAP and AP are alter egos of one another.

      i.  <u>Business Purpose</u>

"This factor looks to overlap in the type of work performed." *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 377 (6th Cir. 2019) (citation omitted). Here, DAP's and AP's employees often worked side-by-side on the same projects, where they performed similar work, used the same equipment, and were subject to the same supervision. While Defendants

11

contend that this was merely the product of DAP's and AP's Subcontractor Agreement, the Court finds it significant that AP has been DAP's sole customer since at least 2016. DAP has operated solely for AP's benefit since then, with its workforce and resources directed entirely toward supporting AP's business interests.

Furthermore, DAP has acted in furtherance of AP's business interests by requesting Local 98 targeting funds for AP's projects. For example, on September 28, 2018, Patrick Day sent Daniel Allor an email with the subject line "Target Money," stating that AP needed approximately $86,000 to bid on the "Funac" job in Auburn Hills, Michigan. ECF No. 78-13, PageID.1386. Shortly thereafter, DAP submitted a request for approximately $87,000 in Local 98 targeting funds for the "Funac" job, also in Auburn Hills, Michigan. ECF No. 78-14, PageID.1388. As a non-union contractor, AP was itself ineligible to receive these funds.

Taken together, these facts demonstrate overlap in DAP's and AP's business purposes. Therefore, this factor supports a finding of alter ego status.

### ii. Operations

This factor examines the overlap in the companies' day-to-day operations, including whether they share an office space and jointly manage payroll, bills, and other administrative tasks. *See Trs. of Operating Eng'rs Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, No. 2:15-CV-12272, 2018 WL 731944, at *5 (E.D. Mich. Feb. 6, 2018), *aff'd sub nom. Trs. of Operating Eng'rs Loc. 324 Pension Fund*

*v. Bourdow Contracting, Inc.*, 919 F.3d 368 (6th Cir. 2019); *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 377 (6th Cir. 2019). Also relevant is "continuity of work force," which examines "whether the new company attracted employees of its own or employed a number of former employees of the older company." *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 377 (6th Cir. 2019) (cleaned up) (citation omitted).

This factor strongly supports a finding of alter ego status. First, there has been substantial overlap in the day-to-day operations of DAP and AP. DAP and AP share an office space and business address. From 2014 through at least 2023, AP employees processed payroll for both DAP and AP. Furthermore, from 2014 to 2021, AP employees processed DAP's fringe benefit payments to the Funds on DAP's behalf. AP employees also submitted tax and corporate documents on DAP's behalf. Lastly, Pam Fife, an AP employee, was DAP's point of contact during an audit by the Funds, which led auditors to believe AP and DAP were the same entity.

While, as Defendants point out, DAP's and AP's shared use of an office space and administrative services was done pursuant to a lease agreement, this agreement was between D&D Allor Investments and AP, not DAP and AP. Furthermore, the existence of this agreement does not negate the substantial overlap between DAP's and AP's operations, and to hold otherwise would allow parties to evade alter ego

liability under the guise of an arm's length agreement.

Second, there has been some continuity of workforce. For instance, Jeff Fife was a superintendent at DAP from 2008 through 2012. He left DAP in 2012 to become a superintendent at AP, with no gap in his employment.

Third, the Court finds it significant that several of DAP's long-time employees were unaware of AP's existence until relatively recently. For example, Sean Moore worked at DAP from 2004 through April 2023. ECF No. 78-18, PageID.1445. He worked as a foreman for approximately sixteen years, and towards the end of his time with DAP, he served as the main general foreman for most of its work. *Id.* Nevertheless, it was not until November 2022 that he learned of AP's existence and that AP was owned by Patrick Day. *Id.* Prior to this, Mr. Moore was under the impression that Patrick Day worked for DAP as an estimator. *Id.* Similarly, Michael Biber, who has worked for DAP on and off since 2003, only recently learned of AP's existence. ECF No. 78-19. Notwithstanding the fact that DAP changed the nature of its business in 2014, neither Mr. Moore nor Mr. Biber have observed any changes in DAP's day-to-day operations. ECF Nos. 79-18, 79-19.

Taken together, these facts demonstrate that there was significant overlap in DAP's and AP's operations. Therefore, this factor strongly supports a finding of alter ego status.

### iii. Equipment

This factor "consider[s] the equipment used by each company." *Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 795 (6th Cir. 2012) (emphasis added). Here, it is uncontroverted that AP supplied all of the equipment needed for its jobs, and this equipment was used by AP's and DAP's employees. Contrary to what Defendants suggest, satisfaction of this factor does not require a showing that one company purchased the equipment of the other. Overlap in the equipment used by both companies is sufficient. *See, e.g.*, *Plumbers Local 98 Defined Benefit Pension Fund v. Premier Plumbing and Mech., LLC*, No. 04-74964, 2006 WL 2623370, at *2 (E.D. Mich. Aug. 11, 2006) (finding one company's use of the other company's equipment sufficient to support alter ego finding); *Trs. of the Title, Marble, and Terrazzo Indus. Ins. Fund v. Hard Rock Stone Works, Inc.*, No. 19-cv-11093, 2021 WL 3089352, at *4 (E.D. Mich. July 22, 2021) (same). Therefore, this factor supports a finding of alter ego status.

### iv.  Customers

This factor looks to overlap in "customer base." *Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 796 (6th Cir. 2012). Here, it is undisputed that when DAP stopped bidding on work in 2014, AP acquired work from several of DAP's former customers. Furthermore, DAP indirectly services AP's clients by supplying labor for their projects. Given that AP is DAP's sole customer, AP's clients are the only entities serviced by DAP. Therefore, there is

overlap in the customer base serviced by DAP and AP, and thus this factor supports a finding of alter ego status.

           v.  <u>Supervision</u>

"This factor looks to overlap in those who hold supervisory roles." *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 377 (6th Cir. 2019). A supervisor is "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them . . . [if] such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." *Id.* (quoting 29 U.S.C. § 152(11)) (alteration in original).

Here, there was overlap in those holding supervisory roles at DAP and AP. Jeff Fife, a superintendent at AP, was perceived by employees to be a supervisor. *See* ECF No. 78-18, PageID.1446. He assigned manpower, provided information on projects, and disciplined employees as necessary. *Id.*; ECF No. 78-19, PageID.1451; ECF No. 78-17, PageID.1434. Despite being employed by AP, he exercised supervisorial authority over DAP employees. ECF No. 78-19, PageID.1451. For instance, he reviewed and discussed timecards with DAP employees. ECF No. 78-18, PageID.1449. He also interviewed and hired personnel to work for DAP. ECF No. 78-18, PageID.1448; ECF No. 78-19, PageID.1451; ECF No. 78-15,

PageID.1418. Furthermore, several DAP employees perceived him as discharging these duties pursuant to employment with DAP. ECF No. 78-18, PageID.1446; *see* ECF No. 78-19, PageID.1451. Similarly, Joe Fife—Jeff Fife's brother and a superintendent at DAP—exercised supervisorial authority on the field, including over AP employees. ECF No. 78-15, PageID.1401, 1419. He also worked with Jeff Fife to assign and schedule work for both DAP and AP employees. ECF No. 78-17, PageID.1436-37. Therefore, this factor supports a finding of alter ego status.

### vi.  Management

This factor looks to "the nature of the management structure in the two companies," including overlap in individuals who "played a managerial role." *Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790, 795 (6th Cir. 2012). Since at least 2008, Jeff Fife and Joe Fife have engaged in managerial work, as they are responsible for assigning and scheduling manpower. From approximately 2008 to 2012, the two performed these functions as DAP employees. After Jeff Fife moved to AP in 2012, they continued working together to execute these responsibilities. Therefore, this factor supports a finding of alter ego status.

### vii.  Ownership

"This factor looks to overlap in those with an ownership interest." *Trs. of Operating Eng'rs Local 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 379 (6th Cir. 2019) (citation omitted). Here, it is undisputed that there is no

overlap between DAP's and AP's ownership. DAP is 100% owned by Daniel Allor, and AP is 100% owned by Patrick Day. Therefore, this factor does not support a finding of alter ego status.

viii.    <u>Intent to Evade Collective Bargaining Agreement</u>

This factor looks to "evidence of intent on the part of the two companies to avoid the effect of the collective bargaining agreement." *Road Sprinkler*, 669 F.3d at 796. Intent is "neither a prerequisite factor, nor is it more important than the other factors." *Trs. of Operating Eng'rs Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 379 n.5 (6th Cir. 2019). Relevant to this inquiry is the timing of, and the individuals involved in, the old company's "demise" and the new company's "formation." *Id.* at 379.

Pursuant to its CBA with Local 98, DAP was required to hire union employees for *all* projects falling within a certain geographic area, paying them union wages and benefits. As a non-union contractor, however, AP was not subject to these requirements. Several uncontroverted facts suggest that DAP and AP intentionally entered into their Subcontracting Agreement to evade DAP's requirements under the CBA. First, AP became operational during the same year that DAP stopped bidding on work and became a "staffing agency." This is also the same year DAP and AP entered into their Subcontracting Agreement. Second, DAP's and AP's operations are closely intertwined, and AP has been DAP's sole client since at least 2016. Third,

18

prior to starting AP, Patrick Day worked for Allor Mechanical, another company owned by Daniel Allor. Lastly, despite no longer bidding on projects, DAP has nevertheless continued to request targeting funds from Local 98 for AP's projects—funds that AP is not otherwise eligible to receive. These facts, taken together, suggest that DAP and AP intentionally structured their relationship to allow AP to supplement its workforce with non-union employees, while simultaneously enjoying the benefits of collective bargaining with Local 98 that it otherwise would not receive—namely, requesting and receiving targeting funds. Therefore, this factor supports a finding of alter ego status.

In sum, seven of the eight factors weigh in favor of a finding of alter ego status—business purpose, operations, equipment, customers, supervision, management, and intent—and only one of the factors—ownership—weighs against such a finding. Therefore, the Court concludes that Defendants DAP and AP are alter egos of one another. Accordingly, with respect to this issue, Plaintiffs' motion for summary judgment is granted, and AP's and DAP and Daniel Allor's motions for summary judgment are denied.

### B. DAP's Alleged Breach of CBA and Violation of ERISA Section 515

Next, all parties cross-move for summary judgment on Plaintiffs' claims that DAP breached its CBA with Local 98 and violated Section 515 of ERISA by failing to pay benefit contributions for all employees performing work covered by the CBA.

Plaintiffs assert that DAP is bound to a CBA with Local 98 requiring it to pay fringe benefit contributions, and that its failure to make such payments amounts to a breach of the CBA and a violation of Section 515.[1] In contrast, Defendants argue that DAP's February 18, 2009 letter to MCA and March 2, 2009 letter to Local 98 terminated its participation in collective bargaining with Local 98, and therefore it was not required to pay fringe benefits from then onward.

At the onset, the Court finds that DAP's letters to MCA and Local 98 did not validly terminate its participation in collective bargaining with Local 98. The CBA in effect at the time required that written notice of termination be sent to Local 98 "not more than ninety (90) days nor less than sixty (60) days prior to its expiration date." ECF No. 79-3, PageID.1988. With this CBA set to expire on May 31, 2011, notice needed to be sent to Local 98 between March 2, 2011 and April 1, 2011 to be timely and valid. DAP's letter to MCA did not terminate its participation in the CBA because it was not sent to Local 98, nor was it timely. DAP's letter to Local 98 also did not terminate the CBA, as it too was untimely. Therefore, DAP was bound by this CBA until its expiration.

---

[1] Under Section 515, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

Second, even though DAP did not sign any subsequent agreements with Local 98, its conduct following the expiration of the CBA demonstrated its intent to continue to be bound by its terms. As the Sixth Circuit has recognized, an "expired, signed collective bargaining agreement . . . may continue to bind an employer if the employer demonstrates an intent to continue to be bound." *Mich. Bricklayers & Allied Craftsmen Health Care Fund v. Nw. Const., Inc.*, 116 F.3d 1480 (6th Cir. 1997) (unpublished table opinion) (citing *Cent. States, Se. and Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 461 (6th Cir. 1989)). Factors relevant to this inquiry include "the payment of union wages, the remission of union dues, the payment of fringe benefit contributions, the existence of other agreements evidencing assent[,] and the submission of the employer to union jurisdiction, such as that created by grievance procedures." *Trs. of Painters Union Deposit Fund v. L&R Painting, LLC*, No. 21-11780, 2024 WL 4341340, at *4 (E.D. Mich. Sept. 27, 2024) (citation omitted). Here, it is undisputed that following the expiration of the CBA, DAP continued to obtain personnel from Local 98, paying them union wages and fringe benefits. DAP also continued to request and receive Local 98 targeting funds, which are available only to contractors that collectively bargain with Local 98. Furthermore, the CBA expressly contemplates that absent a valid termination, it would remain in effect from year to year.

Defendants DAP and Daniel Allor claim this conduct does not demonstrate

DAP's intent to be bound because it was merely maintaining the status quo following its termination of the CBA, as required by the National Labor Relations Act ("NLRA"). Following the expiration of a CBA, the NLRA imposes differing obligations on employers depending on whether the CBA falls within the purview of Section 9(a) or Section 8(f) of the Act. Under Section 9(a), employers are obligated to bargain with unions that have been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a); *see also Crackers Demo, LLC v. Operating Eng'rs Local 324 Pension Fund*, No. 22-cv-12821, 2024 WL 761846, at \*5 (E.D. Mich. Feb. 23, 2024). Employers are also required to continue bargaining with the union upon the expiration of a CBA, as well as "freeze the status quo and honor the terms and conditions of [the] expired collective bargaining agreement as they negotiate a new one." *Operating Eng'rs' Local 324 Fringe Benefit Funds v. Rieth-Riley Construction Co.*, 43 F.4th 617, 619 (6th Cir. 2022) (citation omitted) (cleaned up).

Section 8(f), on the other hand, creates a limited exception to this majority support requirement for employers in the construction industry, allowing them to sign a "pre-hire" agreement with a union regardless of the union's majority status. 29 U.S.C. § 158(f); *see also Crackers Demo*, 2024 WL 761846, at \*5. "The reason for this limited exception lies in the unique nature of the construction industry, which

is organized differently because employees frequently work for multiple employers for short periods of time." *Crackers Demo*, 2024 WL 761846, at *5 (quoting *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518-19 (5th Cir. 2007)). Upon the expiration of a CBA governed by Section 8(f), the construction-industry employer may refuse to bargain with the union after the CBA expires and has no obligation to maintain the status quo. *Id.*

The National Labor Relations Board has recognized that CBAs with construction-industry employers are presumptively governed by Section 8(f). *John Deklewa & Sons*, 282 N.L.R.B. No. 184 (1987); *see also Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80*, 876 F.2d 1245, 1249 (6th Cir. 1989) (adopting *Deklewa*'s distinctions between Section 9(a) and Section 8(f)). The party claiming that the construction-industry CBA falls within the scope of Section 9(a) bears the burden of proving the existence of such a relationship with proof of "a union's express demand for, and an employer's voluntary grant of, recognition to the union as bargaining representative based on a contemporaneous showing of union support among a majority of the employees in an appropriate unit." *J&R Tile*, 291 N.L.R.B. 1034, 1037 (1998).

Here, DAP has offered no evidence nor argumentation demonstrating that its CBA with Local 98 was governed by Section 9(a) instead of Section 8(f). As such, the CBA is presumptively governed by Section 8(f), which did not require DAP to

maintain the status quo. And even if DAP did have such an obligation, its conduct went beyond merely maintaining the status quo, as the CBA did not obligate DAP to request and receive Local 98 targeting funds. Therefore, the Court concludes that DAP's conduct following the CBA's expiration demonstrated an intent to continue to be bound by the expired CBA. To find otherwise would permit DAP to reap the benefits of collective bargaining with Local 98—namely, receipt of targeting funds—without upholding its end of the bargain. Furthermore, as DAP's alter ego, AP was also bound by the expired CBA. *Trs. of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009) (finding that alter ego liability "operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer").

Pursuant to the CBA, DAP and AP were obligated to pay fringe benefit contributions on behalf of *all* employees, including non-union employees, who performed CBA-covered work. "As a matter of law, collective bargaining agreements may require employers to contribute funds for all employees, not just employees who are members of the union." *Trs. of B.A.C. Local 32 Ins. Fund v. Fantin Enterprises, Inc.*, 163 F.3d 965, 969-70 (6th Cir. 1998). "The absence of language distinguishing union and non-union employees indicates that the agreement covers all employees." *Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir. 1984).

Here, the CBA requires DAP and AP to pay fringe benefit contributions to Plaintiffs Plumbers Local 98 Defined Benefit Pension Fund, Plumbers Local 98 Defined Contribution Fund, Plumbers Local 98 Insurance Fund, Plumbers Local 98 Sub Trust Fund, and Plumbers Local 98 Retiree Benefit Fund for "each employee" covered by the agreement, and to Metro-Detroit Plumbing Industry Training Trust for "each unrestricted journeymen" covered by the agreement. ECF No. 79-3. This language is broad and does not expressly exclude non-union members. While the CBA contains a union shop clause, the Sixth Circuit has held that provisions of this nature do not limit an employer's obligation to pay fringe benefit contributions only for union employees.[1] The CBA does not otherwise distinguish between union and

---

[1] Specifically, the union shop provision contained in the CBA provides that "[a]ll employees, who are members of the Union at the time of the signing of this Agreement, shall remain members in good standing as a condition of their employment," and that "[a]ll other employees, as a condition of their employment, shall become and remain a member of the Union for the term of their employment[.]" ECF No. 79-3, PageID.1968. In *Teamsters Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 318 (6th Cir. 1984), the CBA at issue required the employer to pay fringe benefit contributions on behalf of "all employees covered by this agreement." The Sixth Circuit held that a union shop clause requiring "that all employees covered by this agreement . . . become and remain members in good standing in the Union" did not limit the employer's obligation to pay fringe benefit contributions solely for union employees, as "[t]his language suggests that 'employees covered by this agreement' may exist prior to and apart from union-member employees." *Id.*; *see also Fantin Enterprises*, 163 F.3d at 970 (finding that contributions were contractually required for all employees, including non-union employees, despite agreement "contain[ing] a clause requiring that each person working for the employer either be a member of the Union or sign up to become a Union member within eight days of work").

non-union employees. Furthermore, construing the CBA as requiring DAP and AP to make benefit contributions for all employees performing work covered by the agreement, rather than just those who are union members, "is consistent with the NLRA which makes it illegal for an employer to discriminate against union and non-union employees in the award of fringe benefits." *Trs. of the Operating Eng'rs Local 324 Pension v. Glencorp, Inc.*, 178 F. Supp. 3d 600, 606-07 (E.D. Mich. 2016) (citing 29 U.S.C. § 158(a)(3)). As such, DAP and AP were required to pay fringe benefit contributions for all employees who performed work covered by the CBA. Accordingly, the Court grants summary judgment with respect to liability for Counts I and II in favor of Plaintiffs and against Defendants.

With respect to damages, however, a question of fact exists with respect to the amount of outstanding fringe benefits owed by DAP and AP. Furthermore, there is a question of fact with respect to the duration of time in which DAP and AP were bound by the CBA. Specifically, the record before the Court is unclear regarding whether DAP's conduct demonstrating an intent to be bound by the CBA has been continuous since its expiration or whether it was limited to a specific duration of time. A question of fact also exists with respect to the time period during which DAP and AP have been alter egos of one another.

### C. Daniel Allor's and Patrick Day's Alleged Breach of Fiduciary Duty

Next, Plaintiffs, DAP, and Daniel Allor cross-move for summary judgment

on Plaintiffs' breach of fiduciary duty claim. Plaintiffs argue that Defendants Daniel

Allor and Patrick Day breached their fiduciary duties under ERISA by failing to pay

outstanding fringe benefit contributions. Defendants DAP and Daniel Allor, in

contrast, assert that Daniel Allor had no fiduciary duties under ERISA because he is

not a plan fiduciary.

Under ERISA, "a person is a fiduciary with respect to a plan to the extent []

he exercises any discretionary authority or discretionary control respecting

management of such plan or exercises any authority or control respecting

management or disposition of its assets." 29 U.S.C. § 1002(21)(A). "[B]enefit fund

contributions are plan assets as soon as they are *due and owing*." *Trs. of the*

*Operating Eng'rs Local 324 Pension v. Glencorp, Inc.*, 178 F. Supp. 3d 600, 607

(E.D. Mich. 2016) (emphasis in original). Title 29 U.S.C. § 1109(a) imposes

personal liability on ERISA plan fiduciaries:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this
> subchapter shall be personally liable to make good to such plan any losses to
> the plan resulting from each such breach, and to restore to such plan any
> profits of such fiduciary which have been made through use of the assets of
> the plan by the fiduciary, and shall be subject to such other equitable or
> remedial relief as the court may deem appropriate.

As such, "[a]ny person who is a fiduciary with respect to a plan becomes personally

liable for breach of [his] obligations for failing to pay fringe benefits when they

become due." *Bricklayers Pension Trust Fund—Metro. Area v. E&R Masonry*

*Constr., Inc.*, No. 13-cv-14917, 2015 WL 12990250, at *4 (E.D. Mich. Mar. 31, 2015) (citing 29 U.S.C. § 1109(a)); *see also Glencorp*, 178 F. Supp. 3d at 608 (characterizing delinquent fringe benefit contributions "as de facto mismanagement of plan assets").

First, the Court notes that Plaintiffs' complaint does not allege a breach of fiduciary duty cause of action against Patrick Day. Therefore, Plaintiffs' Motion for Partial Summary Judgment is denied with respect to this issue.

Second, the Court finds that Daniel Allor is a plan fiduciary. He is the final decisionmaker with respect to what bills and invoices are paid by DAP. During the time in which DAP and AP have owed outstanding fringe benefits, DAP has paid its personnel and sent targeting funds to AP. ECF No. 44; ECF No. 78-17, PageID.1276. Furthermore, as evidenced by their continuing operations, DAP and AP have likely paid other corporate operating expenses. These uncontroverted facts demonstrate that fund assets, in the form of unpaid contributions, were diverted for other purposes or simply not paid as a result of Daniel Allor's personal, discretionary control and management of these assets. Therefore, the Court concludes that Daniel Allor breached his fiduciary duty under 29 U.S.C. § 1109(a). The Court thus grants summary judgment with respect to liability for Count III in favor of Plaintiffs and against Defendants DAP and Daniel Allor. As discussed above, questions of fact exist with respect to damages.

### D. Daniel Allor's and Patrick Day's Alleged Personal Liability Under Corporate Veil Piercing Theory

Next, Plaintiffs, DAP and Daniel Allor, and Patrick Day cross-move for summary judgment with respect to Plaintiffs' claim that DAP's and AP's corporate veils should be pierced, resulting in Daniel Allor's and Patrick Day's personal liability for unpaid fringe benefits. The federal common law provides the veil-piercing standard in ERISA cases. *Trs. of Mich. Reg'l Council of Carpenters' Emp. Benefits Fund v. H.B. Stubbs Co.*, No. 2:14-CV-11393, 2015 WL 1952149, at *2 (E.D. Mich. Apr. 29, 2015). Under this standard, "[a] corporation is presumed to be a separate entity from its shareholders." *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 384 (6th Cir. 1991). Nevertheless, "the corporate veil may be pierced if the court finds substantial reason for doing so after considering three general factors: (1) the amount of respect given to the separate identity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) (cleaned up) (citation omitted). In assessing these factors, "courts frequently consider more specific factors such as undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the

corporation is merely a sham." *Id.* at 302-03 (citation omitted). Furthermore, the Sixth Circuit has noted that "deference to the corporate identity may be particularly inappropriate in relation to ERISA because Congress enacted ERISA in part to protect employees who were being deprived of anticipated benefits by a corporate sham." *Laborers' Pension Trust Fund v. Sydney Weinberger Homes*, 872 F.2d 702, 704 (6th Cir. 1988) (citation omitted).

Beginning with the first factor, Plaintiffs have provided evidence that DAP failed to honor certain corporate formalities. DAP has no records of annual reports, bylaws, meeting minutes, and meeting agendas. Furthermore, at her deposition, Cindy Sieloff testified that DAP's corporate officers "usually don't have titles," and that she was only an officer "on paper . . . to deal with the IRS, the bank, the accountants, [and] the State of Michigan." ECF No. 78-11, PageID.1332. However, there is also evidence that DAP maintained some business records, such as payroll. As for AP, Plaintiffs have not offered any evidence demonstrating its failure to abide by corporate formalities. Nor is there evidence demonstrating that Daniel Allor and Patrick Day commingled funds with DAP and AP, or that DAP and AP were merely a sham. Therefore, the Court finds that questions of fact exist with respect to whether Daniel Allor and Patrick Day respected DAP's and AP's separate corporate identities.

Turning to the second factor, the Court finds that Plaintiffs will suffer grave

injustice if Daniel Allor and Patrick Day are not held personally liable for their misconduct. Personal liability is necessary to ensure Plaintiffs receive the contributions they are owed, should DAP's and AP's corporate assets be insufficient to cover damages. Therefore, this factor supports piercing DAP's and AP's corporate veil.

Finally, Plaintiffs have offered sufficient evidence demonstrating that Daniel Allor and Patrick Day used their respective companies to defraud Local 98. As discussed above, DAP has requested Local 98 targeting funds for AP's projects, even though AP is not itself eligible for such funds. Furthermore, there is evidence suggesting that DAP and AP entered into their Subcontracting Agreement to evade DAP's obligations under its CBA with Local 98. Therefore, this factor supports piercing AP's and DAP's corporate veil.

In sum, the Court finds that a question of fact exists with respect to whether piercing DAP's and AP's corporate veil is appropriate. Therefore, Plaintiffs,' Patrick Day's, and DAP and Daniel Allor's motions for summary judgment are denied with respect to Count IV.

**E. Plaintiffs' Motion for Leave to File Sur-Reply**

Lastly, Plaintiffs seek leave to file a sur-reply to Patrick Day's Reply in support of his motion for summary judgment. Plaintiffs argue that Day's Reply introduced the following evidence, which was not disclosed in discovery nor in prior

motion practice: (1) an affidavit from an employee of one of AP's customers, claiming he was unaware of AP ever hiding its existence or operations from the client; (2) a letter from another AP customer, indicating that all of its contracts have been with AP; and (3) what appears to be printouts of an AP client's webpage. The Court did not rely on this evidence in reaching the conclusions articulated above, nor does it believe they create a disputed issue of material fact. Therefore, a sur-reply from Plaintiffs would be futile, as it will not change the Court's determinations. As such, Plaintiffs' Motion for Leave to File a Sur-Reply is denied.

## V.    CONCLUSION

Based on the foregoing, AP's Motion for Summary Judgment is DENIED, Patrick Day's Motion for Summary Judgment is DENIED, Plaintiffs' Motion for Partial Summary Judgment is GRANTED IN PART, DAP and Daniel Allor's Motion for Summary Judgment is DENIED, and Plaintiffs' Motion for Leave to File a Sur-Reply in Response to Defendant Patrick Day's Motion for Summary Judgment is DENIED. Summary judgment with respect to liability for Counts I, II, and III of Plaintiffs' complaint is granted in favor of Plaintiffs and against Defendants. Questions of fact exist regarding damages for these counts. Furthermore, questions of fact remain with respect to Count IV liability, and thus summary judgment on this issue is denied as to all parties.

SO ORDERED.

Dated: March 12, 2025                          /s/Gershwin A. Drain
                                               GERSHWIN A. DRAIN
                                               United States District Judge


### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 12, 2025, by electronic and/or ordinary mail.
                    /s/ Marlena Williams
                    Case Manager